That's Meyer Thank you, your Honor. In May, I please the court. The issue in this case can be resolved by the plain language of Section 2133 of the Animal Welfare Act, which provides, and I quote, The Secretary shall issue licenses to dealers and exhibitors upon application, therefore, in such form and manner as he may prescribe, and upon payment of such fee established pursuant to Section 2153 of this title, provided that no such license shall be issued until the dealer or exhibitor shall have demonstrated that his facilities comply with the standards promulgated by the Secretary pursuant to Section 2143 of this title. So, in this case, Section 2133 makes it very clear that whatever form of a license the USDA decides to issue to facilities that are under its jurisdiction, that license may not be issued until the exhibitor can demonstrate that he is in compliance with all of the Animal Welfare Act standards. And in this case, the kind of license at issue is a renewal license, which the USDA issues to exhibitors every single year when their license is set to expire. What about the fact that the statute doesn't speak directly to renewal licenses? That's right. It doesn't say anything about renewal licenses. It doesn't say anything about initial licenses, Your Honor. It just talks about licenses, and it says whatever It only talks about issuance. It says, it's true, it says issue a license, and it says in whatever form and manner the Secretary shall prescribe, and clearly an initial license, a renewal license, are a form of a license. And in terms of the, to answer your question, Your Honor, about issue. But issuance, when you read the statute, issuance seems to be a one-time event. I mean, that is at least a permissible reading of the statute. Well, Your Honor, I would disagree with that because I think it's very clear from the joint appendix in this case and from the regulations themselves that, in fact, a renewal license is issued to the exhibitor. There's really no question about that. It has to be, first of all, the exhibitor But the renewal, whatever it is, still has the same license number as the license had upon the issue. It has the same license number, but it's a new license. If you look at the joint appendix at page 53, you will see this is what a renewal license looks like. It's a license. It says that the Federal Government certifies that this entity is operating, is licensed under the Animal Welfare Act. It has a new date of expiration. It's suitable for framing. It's a piece of paper that is given to the exhibitor. In addition, Your Honor, if you look at page 51 of the joint appendix, this is the application that has to be submitted by the exhibitor who wishes to renew the license. And if you look at the upper right-hand corner of the actual renewal application for the license, it states that no license may be issued unless a completed application has been received and the applicant is in compliance with the standards and regulations pursuant to Section 2133. To get to your desired position, all Congress would have had to say, no license issued or renewed. That's right, Your Honor, but it's also well established as a canon of statutory construction that Congress knows how to use words when it wants to, and if it chooses not to put certain words in the statute, that is an indication that it intended not to. Here, instead of delineating the kinds of licenses that the Secretary could issue, it said the Secretary can issue licenses in any form he prescribes as long as no such license, whatever form it may take. Well, one of the things that, you know, we're still under the Chevron case, and why isn't it under Chevron at least a permissible interpretation for the agency to say that issuance refers to a one-time event? I mean, you may disagree, I respect the fact that you disagree with that, but as long as the agency's interpretation is a permissible one, what authority do we have to charge in and say, no, you're wrong, you can argue your view, they can argue their view, but, you know, surely the agency is not compelled to read the statute in a way that serves your client. Well, Your Honor, I have several responses to that. First of all, we don't think we're in a Chevron-deafening situation because we think the plain language of the statute, which again covers all forms of licenses, any form of a license that the USDA issues under this statute. It doesn't say all forms of licenses or any form of a license. It says, shall issue licenses in such form and manner as the USDA may prescribe. Correct. It doesn't say any license, all forms of it. It's not quite what you're saying it says. It's correct, Your Honor, but what it does say is, and what has happened here, is that the Secretary has prescribed a form of a license, which they call a renewal license. That is a form of a license, as I showed you. It's a piece of paper. That's right, and it's a piece of paper that is given to the entity and must actually be surrendered if the license expires. For example, if they don't pay their fee on time, automatic termination of the license. Not a problem if they're in violation of the Animal Welfare Act, but if they don't pay their fee on time, automatic termination of the license. And under Section 2.5e of the agency's regulations, that piece of paper I showed you has to be surrendered to the agency. So my first answer to you, Judge Wilkinson, is we don't think we're in the Chevron Step 2 framework because we believe the plain language of the statute answers the question. But if you disagree with me and we're in the... There would be plenty of people who would think the plain language of the statute answers the question, contrary to your view. Okay, and if the court... And both of those views can be argued. There are several reasons why, in this case, the government, if we get to Chevron Step 2, is not entitled to Chevron deference at all. Number one, its interpretation of the statute completely undermines the fundamental purpose of this statute, which is to ensure the humane treatment of animals that are used in exhibitions. If the agency can renew the license of an exhibitor who is in chronic violation of the statute... That's a policy question, pretty much, for Congress.  ...that your view would be necessarily any more humane to animals because under your situation, under your view, you wouldn't have these spot checks because someone who's an exhibitor of animals, one of the things they might hear is an unannounced spot check that finds violations. I guess that's the way lots of programs operate, including Minesafety and others. And if all that's going to happen is these compliance reviews are going to take place at the point of renewal, people just can clean up their act when their renewal date comes around and then they can kind of relax for the rest of the year. And I'm just not sure that the regime that you are arguing for is any more humane than the regime that is in place. But whether it is or whether it isn't seems to me a question a little bit beyond my confidence to answer. It seems to be a policy question. And if you want to upend this whole program, you should go to Congress and ask them to do that. Well, Your Honor, again, we believe the statute already requires exhibitors to demonstrate that they're in compliance with the Animal Welfare Act standards before they are given any form of a license, including a renewal license. Now, under our reading of the statute, that would mean the exhibitor has the burden of proof at the time it seeks to have its license renewed to demonstrate that it's in compliance, whether that's done through an inspection or through photographs or through video or through some kind of expert report, whatever it may be. One of the things you're trying to do, this would create a direct conflict with the Eleventh Circuit? It would, Your Honor, if the Court rules in our favor in this case, that's correct, Your Honor. But the Eleventh Circuit's decision is wrong for several reasons. I understand. You think the Eleventh Circuit's just dead wrong? Yes, Your Honor. So, but as a desirable thing, something where we're talking about the administration of a national program, isn't it at least desirable that some sort of uniformity between circuit decisions obtained where that is possible? The Eleventh Circuit, I read the Eleventh Circuit decision. It didn't seem to me that the decision had somehow jumped the rails. Well, the Eleventh Circuit was wrong for several reasons, Your Honor. First of all, it completely ignored this form and manner language that we are relying on heavily here. And I might point out that the government also completely ignored this argument in its responsive brief. So, as far as we're concerned, it should be conceded. The Eleventh Circuit didn't discuss it at all. The Eleventh Circuit went off both on the issue of issue, which Your Honor has asked me questions about, and did not have before it and did not discuss. So you're saying in the Eleventh Circuit that the agency's reading of the statute is unreasonable and the Eleventh Circuit's reading of the statute is unreasonable? I'm saying that both the Eleventh Circuit and the government's reading of the statute violate the plain language of the statute, number one. And the district courts. Correct, Your Honor. And number two, that there's no Chevron deference owed here because the government's reading of the statute completely undermines the fundamental purpose of the statute because it allows chronic violators who deny animals food, water, and veterinary care... Amy, let's talk about the statute here. Okay. One thing you can discern from Sections 2133 and 2149 is that this statute, by its language, does grant a significant amount of discretion to the agency. And it was clear that the Congress wanted to take advantage of the expertise of the agency in the Department of Agriculture and not have the form of this program shaped in the courts. And when you look at all the discretion that 2133 and 2149 accord the agency, it says licenses in such form and manner as you may prescribe, and then it says the standards are promulgated here by the Secretary. So the Secretary's promulgating all the standards. And remedially, the Secretary has enormous discretion to, he may suspend the license temporarily, but then there's a notice in the hearing, and then after the hearing, the Secretary may suspend the additional period, as he may specify, or revoke such license if such violation is determined to have occurred. In other words, the Secretary is empowered by this program to have a great deal of discretion, including the discretion to determine which violations are substantial and related to animal welfare and which are not. Because it doesn't require immediate revocation or non-issuance. It says suspend for such period as he may specify or revoke such license if it's deemed to have occurred. So the Secretary is able to make gradations of seriousness here. There are some violations that could be purely nominal. Others could be unrelated to animal welfare. Others could be a little more serious to merit a temporary suspension. Others could be so serious as to merit a revocation. But as I understand your position, if there's not complete compliance, whoo, no renewal. That's right, Your Honor. And what does that do to the whole Section 2149 and the Secretary's discretion about estimating the gravity of the infraction? Well, I have two answers, Your Honor. First of all, when you were reciting what 2133 says, with all due respect, Your Honor, you left out the most important provision in our view, which is the proviso. Yes, the Secretary has discretion to issue licenses in such form and manner as he may prescribe, provided that no such license, no such license, Your Honor, whether it's the first license, the second license, the renewal license, the initial license, no such license shall be issued until the dealer or exhibitor shall have demonstrated compliance. Are you putting emphasis on the noun? The Eleventh Circuit put emphasis on the verb. I'm putting emphasis on the proviso, Your Honor, that Congress put in this provision. The second point, Your Honor, I want to make, you're relying on 2149, which applies to suspensions and revocations, which are very different procedures from not renewing a license. Your Honor, they will not renew the license if the $20 fee isn't paid on time. It's automatically terminated at that point in time. But what you're trying to do is you're trying to replace a discretionary regime by putting the agency into a straitjacket. No, Your Honor. You're saying that any little infraction, any little infraction, no matter how minor, boom, you're out. That's not true, Your Honor. That's not true, Your Honor. The consequences of revocation and suspension, which are covered by 2149, are very different than the consequences of not having your license renewed. If your license is suspended and eventually revoked, you are forever precluded from applying for a license again. If your license is not renewed because you didn't pay your fee on time or you're not in compliance with one of the standards, all you have to do is reapply for another license. All right. Well, thank you very much. And you have some rebuttal time. Thank you, Your Honor.  Thank you, Judge. Good morning. May it please the Court. My name is Matthew Fesnik. I represent the United States Department of Agriculture. The Court's, I think, pretty much figured this out. The sole issue in this case, which is a purely legal issue, is whether the USDA's license renewal scheme is entitled to showround deference. Well, Appellant's counsel said that you have completely ignored her form and manner argument. What's your response to that? I don't think, I mean, the District Court found that the form and manner language in 2133 supported showround deference. And I don't see any reason to depart from the District Court's reasoning. Frankly, I don't. The form and manner is related to how applications are processed, how licenses are distributed. I don't really see how that connects at all to the question in this case as to whether a demonstration of compliance is required for renewal. What is the purpose of the renewal scheme? The purpose? Just to collect money? I mean, it seems to me there isn't any monitoring, per se, that goes on. So what's the purpose of it? I think it's twofold, Your Honor. It's probably to collect fees. Obviously, the agency does expend resources by managing these licensed entities, going out and inspecting them periodically. So it is a means to recoup revenue. It is also just, and I think this goes to any licensing scheme. You know, people go out of business or change their location of their business or any number of things. They change the number of animals or what they're doing. The annual requirements, which include not just the fee, but the annual report, change of address, allows the agency to keep current records of who these licenses are, who's actually in business, what they're doing. Well, is it arbitrary and capricious to allow reliance on an application that says we are in compliance when you know they aren't? Well, Your Honor... That's kind of a tough... It seems to me that that's really one of the toughest issues in this case. Well, Your Honor, I think you're referring to an argument one of the amicus briefs raised, because that wasn't part of PETA's... Right, I understand. So the question... The Humane Society had that in their brief, I believe. Yes, Your Honor. So that's a really tough one, because it's a stretch, I believe, to say that someone who has gotten a citation maybe a week, maybe a month, maybe a couple of months before their renewal date is knowingly, or at least attributing to the agency knowledge that that person is not compliant on the renewal date. Because, obviously, time elapses. When citations, when inspections occur, if any kind of deficiency is found, it's the agency's practice, typically, unless there's life or limb at stake of the animal, to prescribe remediation, to give that licensee time to fix the problem. And, frankly, most licensees would follow through with that. So to say that the agency knows that some kind of certification is false based on an inspection that occurred weeks or months prior, I don't see how that follows, Your Honor. Well, the agency certainly has to stand by its inspection, doesn't it? And if its inspection shows that this operation is not in compliance, how is it not arbitrary to then issue a renewal based on a representation that is contrary to the agency's own inspection? But, again, that presumes, Your Honor, that the licensee has not taken any remedial action in the interim time between the inspection and renewal. Okay, but what if the inspection occurs the day before? You know, 5 o'clock in the afternoon. And then the licensee fills out a form saying we're in compliance and the agency knows they're not. Couldn't have been. Well, I think, in that circumstance, Your Honor, I think that goes back to the discretion of the agency to, again, as Judge Wilkinson was pointing out, weigh seriousness of... As I understand it, under their scheme, you would have to revoke the license for any citation, no matter how serious. And so, in terms of arbitrary and capriciousness, to lodge that kind of authority in an agency that you would revoke the license for anything of noncompliance, no matter how serious. I'm not sure what that does to Section 2149, which gives the agency discretion as to the kind of penalty that it wants to weigh. In other words, we would be lodging an arbitrary power in the agency to revoke upon minor infraction. And that's how... What Congress was... After it gave the agency the discretion to weigh the gravity of any kind of noncompliance. Beyond that, what does this do? What does their interpretation do to the notice and hearing provision? Thank you for mentioning that, Judge Wilkinson. Yes, you are absolutely correct. 2149 not only gives discretion to that agency, but it does mandate, in particular, that certain conditions are met that licensees get due process. And just to read from 2149, if the secretary has reason to believe that any person licensed as a dealer, exhibitor, or operator of this title has violated or is violating any provision, then he may suspend or revoke after notice and hearing. I'll paraphrase the end of it. But the point I'd like to make to the panel is it's a conditional statement. And the if, the conditions are secretary has reason to believe that a licensee is committing violations. And the circumstances that PETA raises, both those conditions are met. Because even if you're talking about the day before the renewal date, that licensee has that privilege. He is exercising his privilege under a valid license at that point. And according to PETA, deficient inspection would give the secretary reason to believe that maybe there's some kind of problem, compliance problem. And if those two conditions are met, Congress says to take administrative action against the license, the agency has these two options, suspension or revocation, and due process is required. So we guess... There does seem to be a compliance problem with this operator of Rabbit Ridge Kennel that's mentioned in the Humane Society brief who's had hundreds of violations since May 2007, seems to never be in compliance. So has that license either been revoked or suspended? Your Honor, I can't speak. I don't know the answer to that question. Did you read the Humane Society's amicus brief? Yes, Your Honor, I did. Because they do, they indicate that that person's license has been renewed every year, issued for 25 years, despite clear evidence of suffering by hundreds of animals in the facility and repeated failures of routine inspections up to March 2016 renewal, which is the last time they looked at it before they wrote the brief. Seems to me like that would have, in your preparation for argument, might have been at least one thing, at least one exhibitor you would have wanted to look at. Well, Your Honor, I apologize that I hadn't done that. I did actually look at, I think it was Humane Society's amicus brief. They mention Harry Hampton and Lazy Five Ranch. It was certainly one of the amicus briefs. And they talk a lot about a camel that had overgrown toes. And I did actually, in preparation for argument, pull a May 25, 2016 inspection report for Harry Hampton. And I think this might illustrate some of what's going on here. So what happened, Harry Hampton was cited for a couple issues of noncompliance. One was this camel that had overgrown hooves. According to the inspection report,  had scheduled someone to come out and trim the hooves. Okay, but what about this rabbit? Earlier you said that the inspectors wouldn't step in, of course there'll be a hearing, unless something's really bad, wrong with the animals, like loss of limb or potential life. What about this? Among other things, inspectors have found emaciated dogs whose ribs, vertebrae, and hip bones were protruding, dogs with wounds and lesions, some of which were retinosing, dental disease, eye infections, and injured limbs, and dogs and puppies living in 100 degree temperatures, who exhibited clear signs of heat stress, including total non-responsiveness. That's a bit different than overgrown hooves. And perhaps you could, if you didn't look at it, you didn't look at it. Yes, like I said, there is a process for the agency to take enforcement action in those circumstances. Oh wait, I left something out. Some of the dogs in his facility were so sick that they had to be euthanized. That was in 2011. Forgot that part. That didn't pique your curiosity to see if in fact these people were still in business? I'm sorry I did not check that. So how would a situation like that be addressed under law? Under law, it's the agency's burden to prove at a hearing in front of an ALJ that a violation has occurred, and the ALJ then has discretion to impose sanction, which would often include civil monetary penalties, suspension or revocation. Would that be appealable to courts under the Administrative Procedure Act? No, it's appealable directly to the Court of Appeals under the Animal Welfare Act. Under the Animal Welfare Act. So in other words, there's a mechanism for addressing individual violations and finding out as a matter of law and a matter of hearing whether those are correct or whether they're not, and both the principles of the Administrative Procedure Act and the provisions of the Animal Welfare Act provide that individual violations can be raised not only before a hearing officer and an ALJ, but the decision can be appealed to the Court of Appeals. That is absolutely correct. Thank you. So just going back to basics, I think 2149, the due process provision, as well as the ambiguity of 2133 issue clearly does not unambiguously apply to renewals. I'll just speak briefly to, I guess, prong two as well. The distinction between an initial issuance and a renewal has existed since the agency first promulgated regulations in 1967. So this practice has existed 50 years now. Why do you suggest that this process is effective? The process of spot checks. Well, I guess my first answer would be is that this is a situation where Congress has delegated to the agency to accumulate expertise in this area and to do what they think best. And rather than me speaking as a lawyer, I would just refer the Court to the agency's answer in the 2004 Federal Register when essentially a commentator proposed a change that is exactly along the lines of what PETA urges the Court to impose judicially. And the agency said, look, we have this accumulated expertise. Number one, we want random inspections versus scheduled inspections that would occur if it was done in conjunction with a renewal. And secondly, we want to maintain a cooperative approach. We want to try to work with licensees and we save our resources to really go after the worst violators. Is there any other private actor that could bring a challenge before the ALJ? Or is it purely an agency enforcement action? My understanding is it's purely an agency enforcement action. Certainly private actors can and PETA certainly very often does petition the agency, correspond with them, urging them to take enforcement actions. My understanding is there's no actual record. Do you have any enforcement actions? Do you bring many of them or are most of these things settled informally? I do not know the answer to that. A lot of them are resolved pursuant to consent decrees, is my understanding. Are the examples cited in the Humane Societies brief, have they been tested in any kind of adversary process? Has this been run through any kind of court proceeding? Or is this simply a representation? It's a, and again, I'm not aware, but I have not necessarily done all the research to validate to you that any of these have been through a court proceeding. But it is the agency's policy that, and really this licensing scheme is no different than most other licensing schemes that exist. You know, when I have a driver's license and I get a ticket from a police officer, you know, that's... You don't have, a single speeding ticket or an infraction is not enough to have, to require an automatic revocation. Let's say you apply for renewal of your driver's license. Precisely. And the database shows that you have been given a speeding ticket or two. So that doesn't mean you can't get it renewed. Exactly. But the difficulty I'm having with Appellate's position is that it lumps minor infractions in with major infractions. There's no differentiation. It almost gives the, it almost mandates that the agency act arbitrary and revoke on the occurrence of any minor infraction. And so I'm not sure that's, that's all what Congress intended when it said may suspend, may revoke for such time as... This is an automatic revocation. The analogy, if you have a driver's license, you have a speeding ticket, you don't automatically not get a renewal. Now, if these inhumane practices are going on, and they may be, and if they are, everyone would regard those as serious. But part of the thing is to bring those things to light to Congress. And so you need to modify these kinds of things. And then Congress can look into whether the spot inspection system is working. And whether that's producing more humane results. Because the whole idea here is to have some kind of due process, but to have humane treatment of animals. Now, then Congress can say, well, are these spot inspections ensuring what we want to ensure? Or does inspection at the time of renewal, does that better do it than self-certification? But those are policy judgments. Those are policy judgments as to whether a spot inspection system, which is in place throughout the federal government, food contamination, the Department of Agriculture does not inspect every incoming container cargo for food. Would it be desirable? Yes. The spot inspections may not work. The same thing with all imports. They don't inspect more than 10%, 5%. And it's a question of resources, which again is an appropriations matter. But what's working for the welfare of animals and what's not, I do not know. It's a very complicated world out there. And rather than  let the legislative branch consider the alternatives. Find out what empirically is going to work. I can think of arguments where a required inspection at the time of renewal would be detrimental to animal welfare. What further do you have? I see I'm out of time. The agency's position is exactly as you stated. This is a political question, not a judicial question under Chevron. We ask for affirmance of the decision below. Thank you, Your Honor. Judge Keenan, I want to stress something very important that came up during your questioning of government's counsel. The government is not relying on the certification of compliance as a demonstration of compliance. You won't find that in their brief. And there's a very important reason why. The government's position is that its decisions to renew licenses are not subject to judicial review under the Administrative Procedure Act. So in other words, if they were relying on the certification to say that demonstrates compliance, then someone with Article 3 standing could bring an APA challenge like any other kind of licensing challenge and say, well, your decision to give this renewal license was arbitrary and capricious because look at the record of noncompliance with all these Animal Welfare Act standards. They are not relying on that certification. And in fact, it goes beyond that, Your Honor. They have stressed to both the public and to the courts who have looked at this issue that the certification of compliance is not meant to demonstrate compliance. If you look at the addendum in our brief at page 47, they make it very clear that the certification of compliance is not meant to be a way of demonstrating compliance. They said that in the Wray v. Vilsack case. What authority do we have to require the Department of Agriculture to automatically revoke or not to revoke, to just not to grant a renewal of a license upon the most any kind of minor infraction because that is what you're saying is that any instance of noncompliance with any little standard means renewal is automatically defeated. Your Honor, I think it's very important to stress again the difference between revocation which means you can never operate again under a license under the Animal Welfare Act versus what we're talking about which is you didn't pay your fee on time, you didn't show that you were in compliance with all the standards, you can't get an automatic renewal, but you can go ahead and fix that problem or pay your fee and reapply for a license. Those are very different, Your Honor. And if the infraction really is minor, there's no reason why the exhibitor can't easily fix it. In fact, most of these minor infractions... It says that you cannot revoke a license without a hearing. In other words, you cannot take away someone's property right interest in a license because he may suspend such person's license temporarily but not to exceed 21 days and you have to have, in other words, the suspension of longer than 21 days, you have to have a hearing. If you're going to revoke a license. That's right. We're not talking about revocation, Your Honor. We're talking about something very different than revocation. Suspension or revocation. We're not talking about either suspension or revocation, Your Honor. We're talking about suspension for longer than 21 days, not to exceed 21 days. Your Honor, all we're saying is that if at the time that a license is going to expire by its expiration date, the licensee has no property interest beyond that expiration date. That license is set to expire. I'm not even sure how your proposed program is even going to work. It's not even clear to me exactly what we're going to require the Department of Agriculture to actually do. I'm not sure how it works out in practice. If we are saying this kind of licensing scheme and renewal scheme, this sort of licensure is in effect throughout the federal government. In innumerable programs, it works this way. In innumerable programs, rest upon spot inspections and corrections after spot inspections. Unannounced inspections. Maybe that's not the right way for the whole federal government to go about something, but that's the way it does. That's what the 11th Circuit recognized. You're asking us to upend a whole licensure scheme and renewal scheme based on an ambiguous statute which Chevron indicates we have to accord some respect to agency interpretation in a situation where we can wade into deep waters very quickly and where it's very complicated and the unintended consequences are even more complicated still. Your Honor, Chevron also says that you do not defer to an agency interpretation that undermines the basic purpose of the statute, which is what we have here. Chevron also says you do not defer to agency interpretations that are not issued pursuant to legislative rulemaking, which has not happened here. The only legislative regulatory history that the government relies on is a response to a comment in a preamble to a final rule in 2004. There has never been, and the agency has never shown, that there's ever been any rulemaking where the agency said, here's how we interpret the statute. We must renew the license of any statute. We don't care what they're doing to those animals. We have to issue that renewal license as long as they pay their fee on time and give us a report. They've never explained that to the public, had notice and comment on that interpretation of the statute, nor showed how that interpretation of the statute is consistent with the overall purpose of the statute, Your Honor. So no Chevron deference should be due. Thank you. Thank you very much. I'm sorry. No, you didn't. I didn't mean to be petty. Come down and greet counsel and then we'll take a brief recess.
judges: J. Harvie Wilkinson III, Barbara Milano Keenan, Stephanie D. Thacker